UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YANETT PEREZ PEREZ,<br><br>                              Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>                              Defendants. | Case No.:  25-cv-01821-AJB-SBC<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>(Doc. No. 4) |

Before the Court is the Motion to Dismiss filed by Defendants United States of America and Dennis Boone (collectively, the "United States"). (Doc. No. 4.) The motion is fully briefed. (Doc. Nos. 4; 7–8; 11.)

For the reasons set forth below, the Court **GRANTS** the United States' motion to dismiss. (Doc. No. 4.)

**I.      BACKGROUND**

    **A.      Factual Background**

        **1.      United States Customs and Border Protection Pursuit Policy**

In May 2023, the United States Customs and Border Protection ("CBP") issued CBP Directive No. 4510-026A (the "2023 Pursuit Policy"), which "establishe[d] guidelines to ensure U.S. Customs and Border Protection (CBP) conducts Emergency Driving and Vehicular Pursuits (ED-VPs) in accordance with law and in a manner that minimizes risks

to the public, officers/agents, other law enforcement, and vehicle occupants." (Doc. No. 11 at 5 (§ 1)[1]; *see generally id.* at 4–31.)

The 2023 Pursuit Policy was effective that month and "replace[d] CBP Directive No. 4510-026," which is referenced herein as the "2021 Pursuit Policy." (*Id.* at 5 (§ 3).)

The 2023 Pursuit Policy "entrusts agents, officers, and their supervisors with the ability to conduct pursuits based on their analysis of risk factors, encourages them to consider other available means of apprehending suspects, and reaffirms the overall law enforcement need to conduct pursuits." (*Id.* at 4.) However, the 2023 Pursuit Policy "restricts pursuits in certain circumstances that are considered especially dangerous and also prohibits specific emergency driving procedures that have proven unsafe or ineffective." (*Id.*)

The 2023 Pursuit Policy states that CBP officers "may only conduct vehicle stops when there is reasonable suspicion to believe a violation of law has occurred that the Authorized Officer/Agent has the authority to enforce." (*Id.* at 13 (§ 8.2).) Before initiating a stop, an officer must broadcast certain information to the CBP Communications Center, if the information is available. (*Id.* at 14 (§ 8.5).) After the broadcast, the officer can initiate a vehicle stop by "us[ing] their red and blue emergency lights, at a minimum, as a signal to the driver of the Subject Vehicle to pull off the roadway and stop their vehicle." (*Id.* (§ 8.3).)

If the suspect vehicle fails to yield, the 2023 Pursuit authorizes the officer to "decide not to engage in a Vehicular Pursuit" (*id.* (§ 8.7)) or to initiate a pursuit if the vehicle "Failed to Yield when an Authorized Officer/Agent attempted to stop the vehicle for a violation of law that they have the authority to enforce **AND** The Authorized Officer/Agent has determined that a Vehicular Pursuit is Necessary and Objectively Reasonable" (*id.* at 16 (§ 8.24(3), (4))). "A Vehicular Pursuit is considered Necessary when an Authorized

---

[1]    Page citations refer to the pagination generated by the Case Management/Electronic Case Files system.

25-cv-01821-AJB-SBC

Officer/Agent concludes there is an immediate need to apprehend a subject as part of their enforcement duties based on the totality of the known facts and circumstances." (*Id.* (§ 8.25).) "A Vehicular Pursuit is considered Objectively Reasonable when the Governmental Interest . . . in apprehending the subject(s) at that specific time clearly outweighs the Foreseeability of Risk to the public, officers/agents, other law enforcement, and vehicle occupants." (*Id.* at 17 (§ 8.26).)

"When determining Governmental Interest, the Authorized Officer/Agent shall consider: (1) the severity of the crime at issue, not including the mere act of fleeing as the crime at issue, and (2) whether the subject poses an Imminent Threat to the safety of the officers/agents or others, not including reckless driving in an attempt to evade arrest." (*Id.* at 7–8 (§ 6.16).)

The "Foreseeability of Risk" is the "degree to which a reasonable officer/agent in a given situation should know that a specific harm might result from the actions being performed and the circumstances present." (*Id.* at 7 (§ 6.15).) In assessing the Foreseeability of Risk, an officer must consider the "Pursuit Risk Factors." (*Id.*) These

> may include but are not limited to:
> (1)    if the speed or the erratic, dangerous, or unlawful driving nature of the Subject Vehicle and/or other nearby moving vehicles contributes to unsafe operation, loss of control, or an increased likelihood of injuries resulting from a collision;
> (2)    if the Subject Vehicle is traveling towards areas with dense traffic or intersections that would increase the chance of collision with bystanders, other vehicles, or other objects;
> (3)    if the nature of the area is likely to create unnecessary elevated risks to the public at large (residential, commercial, presence of pedestrian traffic);
> (4)    if weather conditions or lighting might impair visibility or increase the risk that vehicles may lose traction/control;
> (5)    if road conditions (curves, lanes, bridges, unpaved roads, asphalt condition, etc.) increase the risk that vehicles may lose control and/or impact bystanders, other vehicles, or other objects;
> (6)    if the Subject Vehicle appears to be an Overloaded Vehicle, creating unsafe handling characteristics;
> (7)    if there is reason to believe there are Unrestrained Occupants within the

25-cv-01821-AJB-SBC

Subject Vehicle or occupants within areas of the Subject Vehicle that were not intended for passenger transport; [and]

(8)    if the distance between the pursuing Authorized Officer/Agent and the fleeing vehicle is so great that further efforts would be futile or require the Vehicular Pursuit to continue for an unreasonable time and/or distance.

(*Id.* at 9 (§ 6.31).)

"Governmental Interest and Foreseeability of Risk must be evaluated at the time the Authorized Officer/Agent chooses to undertake, continue, or Terminate the Vehicular Pursuit." (*Id.* at 17 (§ 8.27); *see also id.* at 7–8 (§ 6.16).)

After an officer initiates a pursuit, he "must notify a Pursuit Supervisor as soon as feasible during a Vehicular Pursuit." (*Id.* at 18 (§ 8.34); *see also id.* at 22 (§ 8.55).) The officer "will communicate the basis for the Vehicular Pursuit and an assessment of Pursuit Risk Factors as soon as practicable to a supervisor." (*Id.* at 18 (§ 8.34.1).) "If a Pursuit Supervisor has not affirmatively authorized the continuation of the Vehicular Pursuit after being notified and given an opportunity to assess the situation, the engaging Officer/Agent shall Terminate the pursuit." (*Id.* (§ 8.38).)

While a pursuit is ongoing, the pursuing officer "shall continually assess the Pursuit Risk Factors and other considerations." (*Id.* (§ 8.40).) The officer "may Terminate the Pursuit at any time, for any reason, without supervisory approval." (*Id.* at 19 (§ 8.43); *see also id.* at 5 (§ 4.3).) However, the officer "shall Terminate a Vehicular Pursuit when the danger to the public, the officer/agent, other law enforcement, or vehicle occupants outweighs the immediate need to apprehend the subject." (*Id.* at 18 (§ 8.41).) Additionally, an officer "will immediately Terminate a Vehicular Pursuit when directed by a supervisor." (*Id.* at 19 (§ 8.44).)

The 2023 Pursuit Policy states that "[m]andatory compliance with the newly revised training standards and operational procedures will be required following the completion of [its] phased implementation roll-out on May 1, 2023." (*Id.* at 4; *see also id.* at 29 (§ 10).)

25-cv-01821-AJB-SBC

### 2.    The Collision

On the morning of October 22, 2024, a CBP agent observed a silver Infiniti sedan (the "Infiniti") leaving an area where "a group of individuals" were observed "climbing the international border fence." (Doc. No. 1 ¶¶ 50–51.) The Infiniti collided with a CBP vehicle, sustaining some damage to its passenger side, and fled. (*Id.* ¶¶ 51–52.)

Later that day, around 2:15 p.m., CBP officials observed two individuals, including Jesus Atenco Perez ("Perez"), climbing over the border fence. (*Id.* ¶ 54.) The two individuals were picked up by the Infiniti, which was being driven by Sergio Josue Palomera ("Palomera"). (*Id.* ¶¶ 11, 55.)

Defendant Dennis Boone ("Agent Boone") responded to the scene. (*Id.* ¶ 56.) Agent Boone determined that the Infiniti matched the description of the vehicle that collided with a CBP vehicle earlier that morning. (*Id.*) Based on this determination, Agent Boone concluded that there was a need to stop the Infiniti. (*Id.* ¶ 57.)

At approximately 2:19 p.m., Agent Boone activated his vehicle's emergency lights and siren to stop the Infiniti. (*Id.* ¶¶ 11, 13.) However, Palomera did not stop driving. (*Id.* ¶ 13) Instead, Palomera "continu[ed driving] west on [State Route 905 ("SR 905")] at speeds exceeding 80 [miles per hour ("mph")], driving erratically with abrupt lane changes and weaving through traffic." (*Id.* ¶ 13.)

During this time, a Caltrans vehicle was parked on the shoulder of SR 905 and partially obstructing a lane of traffic. (*Id.* ¶ 14.)

Between 2:19 p.m. and 2:20 p.m., Agent Boone initiated a pursuit of the Infiniti. (*Id.* ¶ 12; *see also id.* ¶¶ 11, 13, 20.) Agent Boone "initiated the pursuit based solely on a suspicion of a mismatched license plate." (*Id.* ¶ 30.) Agent Boone was also "[m]otivated by the [Infiniti's] earlier evasion and collision with a Border Patrol vehicle" and so "exhibited heightened agitation and determination to apprehend the silver Infiniti at all costs." (*Id.* ¶ 57.)

During the pursuit, Agent Boone drove "at speeds exceeding 90 mph." (*Id.* ¶ 32.) The pursuit reached "speeds exceeding 110 mph." (*Id.* ¶ 58.) Agent Boone "failed to

communicate critical details of the pursuit to his supervisors or the Border Patrol's dispatch center." (*Id.* ¶ 36.)

At approximately 2:20 p.m., the Infiniti crashed into the Caltrans vehicle at a speed of 85 mph. (*Id.* ¶¶ 20, 46.) The Infiniti flipped multiple times and ejected Perez. (*Id.* ¶ 46.) Agent Boone terminated the pursuit. (*Id.* ¶ 20.)

At approximately 2:25 p.m., emergency medical responders arrived at the scene of the collision, but could not stabilize Perez's condition. (*Id.* ¶ 48.) They took Perez to Scripps Mercy Hospital, where he was pronounced dead at 3:15 p.m. (*Id.*)

Agent Boone's actions allegedly violated the 2021 Pursuit Policy. (*Id.* ¶¶ 3, 15, 17, 24, 31, 33, 36, 58–59.) Agent Boone's supervisors' actions also did not comply with the 2021 Pursuit Policy. (*Id.* ¶¶ 18, 25, 61.) At the time of the collision, Agent Boone had allegedly "failed to complete the mandatory biennial refresher training on pursuit policies in 2024." (*Id.* ¶ 42.)

**B.    Procedural Background**

Around November 27, 2024, Plaintiff Yanett Perez Perez ("Perez Perez"), Perez's mother, filed an administrative claim with the FTCA, which was denied. (*Id.* ¶ 27.)

On July 17, 2025, Perez Perez initiated this Action both individually and as the representative of Perez's estate. (*See generally id.*; *see also id.* ¶¶ 7, 49.) Perez Perez alleges four causes of action.

First, Perez Perez claims that Agent Boone violated Perez's Fourth Amendment civil rights by initiating the high-speed pursuit and causing the fatal collision, and is accordingly liable for the violation under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics* ("*Bivens*"), 403 U.S. 388 (1971). (Doc. No. 1 ¶¶ 63–70.)

Second, she contends that Agent Boone also violated Perez's Fourteenth Amendment civil rights by initiating the high-speed pursuit and is liable for the violation under *Bivens*, 403 U.S. 388. (Doc. No. 1 ¶¶ 71–78.)

Third, Perez Perez asserts that the United States is liable for Perez's wrongful death pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S. C. §§ 1346(b), 2671. (Doc. No.

25-cv-01821-AJB-SBC

1 ¶¶ 79–84.) In particular, Perez Perez alleges that Agent Boone negligently (1) initiated the pursuit and (2) continued the pursuit. (*Id.* ¶ 80.) Additionally, the United States "failed to adequately train or supervise [Agent] Boone on vehicle pursuit policies." (*Id.* ¶ 81.)

Fourth, Perez Perez avers that the United States is liable for Agent Boone's negligent acts under the FTCA, 28 U.S.C. §§ 1346(b), 2671. (Doc. No. 1 ¶¶ 85–90.)

The United States has moved to dismiss all four causes of action pursuant to Rules 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure. (Doc. No. 4.)

This Order follows.

## II.    LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) tests whether the court has subject matter jurisdiction. Lack of Article III standing requires dismissal for want of subject matter jurisdiction under Rule 12(b)(1). *See Nw. Requirements Utils. v. FERC*, 798 F.3d 796, 807 n.9 (9th Cir. 2015).

"A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* The court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citation omitted).

"[I]n a factual attack," on the other hand, "the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air*, 373 F.3d at 1039. In resolving such an attack, unlike a motion to dismiss under Rule 12(b)(6), a court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.* (citation omitted). Moreover, the court "need not presume the truthfulness of the plaintiff's allegations." *Id.* Once the defendant

25-cv-01821-AJB-SBC

has moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of establishing the court's jurisdiction. *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

## B.      Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a plaintiff's complaint. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "[A] court may dismiss a complaint as a matter of law for (1) lack of cognizable legal theory or (2) insufficient facts under a cognizable legal claim." *SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) (citation and internal quotation marks omitted). However, a complaint will survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In making this determination, a court reviews the contents of the complaint, accepting all factual allegations as true and drawing all reasonable inferences in favor of the nonmoving party. *See Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007).

Notwithstanding this deference, the reviewing court need not accept legal conclusions as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It is also improper for a court to assume "the [plaintiff] can prove facts that [he or she] has not alleged." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

## III.   DISCUSSION

### A.      Perez Perez Has Failed to Properly Oppose the United States' Motion to Dismiss.

Preliminarily, the Court must strike Perez Perez's opposition to the United States Motion to Dismiss (Doc. No. 7.)

25-cv-01821-AJB-SBC

Pursuant to Federal Rule of Civil Procedure 11(a), "[e]very . . . paper must be signed by at least one attorney of record in the attorney's name . . . . The court must strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention."

On October 7, 2025, counsel for Perez Perez filed an unsigned opposition to the motion to dismiss. (Doc. No. 7.)

On that same day, the Clerk of Court notified counsel for Perez Perez that the filed document was not signed and instructed counsel to withdraw the unsigned document and to refile it with a signature. (*Id.*)

Counsel for Perez Perez has not withdrawn or refiled the opposition.

Accordingly, the Court "must strike [the] unsigned paper" because the omission has not been "promptly corrected after being called to the attorney's . . . attention." Fed. R. Civ. P. 11(a). The Court thus **STRIKES** the unsigned opposition. *Id.* Because the United States' reply addresses arguments contained therein, the Court will retain access to the unsigned opposition in the Case Management/Electronic Case Files system for ease of reference.

Having stricken the unsigned opposition, the Court notes that in this District, a failure to properly oppose a motion "may constitute a consent to the granting of a motion or other request for ruling by the Court." CivLR 7.1.f.3.c. Nevertheless, the Court declines to treat the unsigned response as a consent to the granting of the motion to dismiss. *See* CivLR 1.1.d. The Court thus proceeds to consider the motion's merits.

**B.    Counts One and Two Fail to State a Claim on Which Relief Can be Granted.**

In Counts One and Two, Perez Perez alleges *Bivens* claims for alleged violations of the Fourth and Fourteenth Amendments. (*See* Doc. No. 1 ¶¶ 63–78.)

Some plaintiffs may seek money damages for alleged constitutional violations under an implied cause-of action theory recognized in *Bivens*. *See Ziglar v. Abbasi*, 582 U.S. 120, 130–32 (2017). However, *Bivens* relief is available only in extremely limited circumstances. In *Bivens* itself, the Supreme Court "recognized an implied cause of action

25-cv-01821-AJB-SBC

against [Federal Bureau of Narcotics] officials for Fourth Amendment violations." *Marquez v. Rodriguez*, 81 F.4th 1027, 1029 (9th Cir. 2023); *see also Bivens*, 403 U.S. at 397. In the subsequent decades, the Supreme Court has extended *Bivens* relief in only two other circumstances. *Marquez*, 81 F.4th at 1029. First, "[i]n *Davis v. Passman*, 442 U.S. 228 (1979), the Court permitted an administrative assistant to seek a damages remedy against her former employer, a congressman, for alleged sex discrimination in violation of the Fifth Amendment." *Marquez*, 81 F.4th at 1029. Second, "in *Carlson v. Green*, 446 U.S. 14 (1980), the Court recognized a *Bivens* remedy in an action brought by a federal prisoner's estate contending that prison officials infringed the Eighth Amendment's Cruel and Unusual Punishment Clause by failing to provide adequate medical treatment." *Marquez*, 81 F.4th at 1029.

More recently, the Supreme Court "has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Abbasi*, 582 U.S. at 135 (quoting *Iqbal*, 556 U.S. at 675). Accordingly, courts now apply a two-step test to determine whether a *Bivens* remedy is available. "First, we ask whether the case presents 'a new *Bivens* context'—*i.e.*, is it 'meaningful[ly]' different from the three cases in which the Court has implied a damages action." *Egbert v. Boule*, 596 U.S. 482, 492 (2022) (quoting *Abbasi*, 582 U.S. at 139–40). Meaningful differences can include

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Abbasi*, 582 U.S. at 140. It may also include a "new category of defendants." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001).

If there is a new context or a meaningful difference, "a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped

25-cv-01821-AJB-SBC

than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 596 U.S. at 492 (quoting *Abbasi*, 582 U.S. at 136).

No *Bivens* remedy is available for Perez Perez's claims.

First, Counts One and Two arise in a new context. For both Counts, Agent Boone and the Doe Defendants belong to a "new category of defendants." *Malesko*, 534 U.S. at 68. As CBP officials, they are not Federal Bureau of Narcotics officials, *cf. Bivens*, 403 U.S. at 389; congresspersons, *cf. Davis*, 442 U.S. at 230; or prison officials, *cf. Carlson*, 446 U.S. at 16. Additionally, the fact that a CBP policy purportedly governed Agent Boone's and his supervisor's conduct presents a distinction between this case and past precedent that "satisf[ies] the [Supreme] Court's permissive test for what makes a context 'new.'" *Quintero Perez v. United States*, 8 F.4th 1095, 1104–05 (9th Cir. 2021).

Second, special factors counsel against extending Perez Perez any *Bivens* relief. In determining whether special factors exist, "the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 582 U.S. at 136.

> [T]he decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide. Those matters include the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies. These and other considerations may make it less probable that Congress would want the Judiciary to entertain a damages suit in a given case.

*Id.* at 136–37. Additionally, "if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.* at 137. Such structures can include "administrative, statutory, equitable, and state law remedies." *Vega v. United States*, 881 F.3d 1146, 1154 (9th Cir. 2018).

Here, an alternative remedial structure is available for both Counts. As *Egbert* explained, Customs and Border Patrol regulations require the agency to "investigate '[a]lleged violations of the standards for enforcement activities' and accept grievances

from '[a]ny persons wishing to lodge a complaint.'" 596 U.S. at 497 (quoting 8 C.F.R. §§ 287.10(a)–(b)). Indeed, Perez Perez filed such a claim with Customs and Border Patrol around November 27, 2024. (Doc. No. 1 ¶ 27.) Such a remedy makes *Bivens* relief unavailable. *Egbert*, 596 U.S. at 497–98 (citing *Malesko*, 534 U.S. at 74).

Because a *Bivens* remedy is not available for either Count One or Two, Counts One and Two are **DISMISSED WITH PREJUDICE**.

**C.  The Court Lacks Subject Matter Jurisdiction Over Counts Three and Four.**

**1.  Sovereign immunity and the FTCA.**

"The United States, as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (citations omitted). "Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Id.* (citations omitted).

"One important immunity waiver that allows suits against the federal government is the FTCA." *Lam v. United States*, 979 F.3d 665, 671–72 (9th Cir. 2020). "The FTCA provides a limited waiver of the sovereign immunity of the United States for torts committed by federal employees acting within the scope of their employment." *Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000) (citation omitted). "Under the FTCA, the United States may be held civilly liable for the torts of its employees 'in the same manner and to the same extent as a private individual under like circumstances.'" *Id.* (quoting 28 U.S.C. § 2674).

"To succeed in district court under the FTCA, a plaintiff must have suffered an injury, a federal employee must have caused that injury, and state law must offer a legal theory that makes that employee's negligence actionable." *Lam*, 979 F.3d at 672. "However, the FTCA's waiver of immunity is limited by a number of statutory exceptions." *Nurse*, 226 F.3d at 1000 (citing 28 U.S.C. § 2680). If the plaintiff's cause of

action falls within one of the exceptions, the district court lacks subject matter jurisdiction. *Id.*

The burden of establishing a waiver falls upon the party asserting jurisdiction. *Prescott v. United States*, 973 F.2d 696, 701 (9th Cir. 1992). Once a plaintiff has identified a waiver, "the United States bears the burden of proving the applicability of one of the exceptions to the FTCA's general waiver of immunity." *Id.* at 702.

Pursuant to 28 U.S.C. § 2680(a), the FTCA's waiver of sovereign immunity "shall not apply" to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

Courts apply a two-part test to determine if this "Discretionary Function Exception" is applicable. First, a court must consider "whether the alleged wrongful conduct violated a specific and mandatory regulation or statute." *Bibeau v. Pac. Nw. Rsch. Found., Inc.*, 339 F.3d 942, 945 (9th Cir. 2003) (citing *United States v. Gaubert*, 499 U.S. 315, 324–25 (1991)). "If so, the conduct is outside the realm of discretion." *Id.* (citation omitted). Second, "[i]f there is no mandatory regulation or statute involved, we then ask whether the conduct was susceptible to being based upon social, economic, or political policy." *Id.* (citations omitted). "[T]he discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz v. United States*, 486 U.S. 531, 537 (1988).

### 2. The 2021 Pursuit Policy does not apply.

Perez Perez alleges the FTCA waives sovereign immunity and renders the United States liable for Counts Three and Four. (*See* Doc. No. 1 ¶¶ 79, 84, 90.) In response, the United States has invoked the FTCA's Discretionary Function Exception to assert that this Court lacks jurisdiction because the 2023 Pursuit Policy vested Agent Boone and his supervisors with discretion over how to pursue suspects and how to train CBP agents. (*See, e.g.*, Doc. No. 4-1 at 12–15 (citing 28 U.S.C. § 2680(a).)

There appears to be some confusion over what CBP policy may have governed Agent Boone's decisions to initiate and to maintain a high-speed pursuit, and his supervisor's oversight of a high-speed pursuit. On the one hand, Perez Perez alleges that Agent Boone's actions violated "CBP Directive 4510-026," which is the 2021 Directive. (*See, e.g.*, Doc. No. 1 ¶ 15.) On the other, the United States focuses on the 2023 Pursuit Policy and what it authorizes. (*See* Doc. No. 4-1 at 7–8, 13–15.)

Perez Perez's references to the 2021 Directive appear to be intentional. The Complaint repeatedly cites "CBP Directive 4510-026" and does not reference "CBP Directive 4510-026*A*"—the 2023 Pursuit Policy—at any point. (*See generally* Doc. No. 1.) Furthermore, Perez Perez's contentions regarding the purported contents of the CBP's governing directive do not align with the 2023 Pursuit Policy's text. For example, Perez Perez contends that "CBP Directive 4510-026, Section 5.2" "mandates that pursuits be initiated only when the need for immediate apprehension outweighs the risks to public safety." (*Id.* ¶ 31.) However, Section 5.2 of the 2023 Pursuit Policy states in full "18 U.S.C. § 758, High Speed Flight from an Immigration Checkpoint." (Doc. No. 11 at 6 (§ 5.2).) Perez Perez also claims that "CBP Directive 4510-026, Section 6.1" "requires agents to maintain a safe distance to avoid pressuring the suspect into increasingly dangerous maneuvers." (Doc. No. 1 ¶ 33.) Section 6.1 of the 2023 Pursuit Policy instead defines "apprehension efforts" as "[a]ny attempted seizure of a Subject Vehicle by Authorized Officers/Agents accomplished through the use of Activated Emergency Equipment or other show of authority." (Doc. No. 11 at 6 (§ 6.1).) The section does not require any pursuit procedures, much less a pursuit distance. (*See id.*) Thus, the Court concludes Perez Perez intended to rely on the 2021 Pursuit Policy.

That reliance is misplaced. When the CBP issued the 2023 Pursuit Policy, it "replace[d]" the 2021 Pursuit Policy. (*Id.* at 5 (§ 3).) The 2023 Pursuit Policy was effective as of "May 2023." (*Id.*) The underlying pursuit and collision in this matter occurred on October 22, 2024. (*See* Doc. No. 1 ¶ 2.) Accordingly, the pursuit and collision took place *after* the 2023 Pursuit Policy became effective and replaced the 2021 Pursuit Policy.

25-cv-01821-AJB-SBC

(*Compare* Doc. No. 11 at 5, *with* Doc. No. 1 ¶ 2.) In turn, the 2021 Pursuit Policy did not apply to Agent Boone's or his supervisors' actions at the time of the underlying events.

Furthermore, the United States' arguments based on the 2023 Pursuit Policy take some precedence because it is the United States that "bears the burden of proving the applicability of one of the exceptions to the FTCA's general waiver of immunity." *Prescott*, 973 F.2d at 702.

The Court accordingly turns to what, if anything, the 2023 Pursuit Policy required of Agent Boone and his supervisors.

### 3. The 2023 Pursuit Policy granted Agent Boone discretion to initiate and terminate the pursuit.

Perez Perez contends that CBP policy prohibited Agent Boone from initiating the pursuit and, subsequently, required Agent Boone to terminate the pursuit. (Doc. No. 1 ¶¶ 15, 17.) In particular, Perez Perez points to the 2021 Pursuit Policy to assert that Agent Boone was prohibited from initiating the pursuit. (*Id.* ¶ 15.) Perez Perez additionally claims that the risks to public safety from the pursuit outweighing the need to stop the Infiniti meant that Agent Boone was required to terminate the pursuit. (*Id.* ¶ 17.)

Perez Perez is incorrect.

In analyzing the Discretionary Function Exception defense, the Court must "look at all the relevant policies in their totality and how they fit together to determine if they are discretionary or mandatory." *Lam*, 979 F.3d at 676. Notably, "the presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations." *Sabow v. United States*, 93 F.3d 1445, 1453 (9th Cir. 1996). "The use of a few mandatory words like 'shall' does not create a mandatory policy if the policy otherwise allows for discretion." *Lam*, 979 F.3d at 677.

Against this backdrop, the applicable provisions of the 2023 Pursuit Policy provide a "suggestive set of guidelines" and not "binding agency regulations." *Sabow*, 93 F.3d at 1453. On initiating a pursuit, the Commissioner's Message that accompanies the 2023 Pursuit Policy explains that the policy's purpose is to provide "a clear framework for

25-cv-01821-AJB-SBC

*weighing* the risks associated with vehicular pursuits (e.g., the dangers posed to the public), against the law enforcement benefit or need." (Doc. No. 11 at 4 (emphasis added).) In doing so, the 2023 Pursuit Policy "entrusts agents, officers, and their supervisors with the ability to conduct pursuits based on *their* analysis of risk factors." (*Id.* (emphasis added).) The 2023 Pursuit Policy goes on to state that "Authorized Officers/Agents are responsible for *their decisions and actions* related to Vehicular Pursuits at all times and in under [*sic*] all circumstances when engaged in a Pursuit." (*Id.* at 16 (§ 8.23).) While engaged in a pursuit, the agent "shall continuously assess Pursuit Risk Factors." (*Id.* at 17 (§§ 8.28, 8.31); *see also id.* (§ 8.29) (identifying eight "Pursuit Risk Factors" that the agent "shall consider . . . to determine Foreseeability of Risk").) As for terminating a pursuit, the 2023 Pursuit Policy states that "Authorized Officers/Agents engaged in a Vehicular Pursuit shall continually assess the Pursuit Risk Factors and other considerations." (Doc. No. 11 at 18 (§ 8.40).) Further, agents "may Terminate the Pursuit at any time, for any reason, without supervisory approval." (*Id.* at 19 (§ 8.43).)

The foregoing language clearly calls upon CBP agents to decide whether to initiate or terminate a pursuit. In doing so, the 2023 Pursuit Policy vests CBP agents with substantial discretion to decide whether to initiate or terminate a pursuit. *See Lam*, 979 F.3d at 678–79.

This conclusion is consistent with other courts' recognition that prior iterations of CBP's pursuit policies granted CBP agents discretion in determining whether to initiate a pursuit. For instance, in *Herrera v. United States*, No. 09-cv-00756-JM-WMc, 2010 WL 4236974, *3 (S.D. Cal. Oct. 21, 2010), the court explained that "[t]he often complex circumstances and variables surrounding a pursuit necessarily require the agent or agents to continually analyze rapidly changing circumstances . . . when deciding to commence, continue, or terminate a pursuit." The court noted that although "an agent is required to consider eleven Safety Factors . . . in determining whether to commence, continue, or terminate a pursuit," there were no "objective hard and fast rules to determine when to conduct or continue a pursuit of a fleeing vehicle." *Id.* Accordingly, the court "conclude[d]

25-cv-01821-AJB-SBC

that the Pursuit Policy vests substantial discretion in Border Patrol Agents and that the Pursuit Policy provides no specific directives that mandate specific action when pursuing fleeing vehicles." *Id.* Similarly, *Gallegos Reyes v. United States*, No. 5:19-cv-00902-OLG, 2020 WL 248688, *2–3 (W.D. Tex. Jan. 15, 2020), recognized that the then-applicable policy "explicitly contemplate[d] an element of choice as to how [CBP agents] should engage in emergency driving and pursuit." Most recently, a district court held that "agents possess discretion in deciding whether to pursue" under the 2021 Pursuit Policy. *Carrillo v. United States*, No. 2:25-cv-00219-KWR-DLM, 2025 WL 3187389, *4 (D.N.M. Nov. 14, 2025), *appeal docketed*, No. 25-2158 (10th Cir. Dec. 19, 2025).

Thus, the Court must conclude that Agent Boone had discretion to initiate and terminate the pursuit unless Perez Perez can identify specific provisions of the 2023 Pursuit Policy that prohibited the initiation of the pursuit or required its termination. *See Berkovitz*, 486 U.S. at 536. Perez Perez does not.

On the initiation of the pursuit, Perez Perez contends that Agent Boone was prohibited from initiating the pursuit because he "failed to adequately consider" certain pursuit risk factors. (Doc. No. 1 ¶ 16.)[2] The problem with this contention is that it necessarily concedes that Agent Boone had discretion to initiate the pursuit because he had to weigh whether the risks of a pursuit outweighed the need to stop the Infiniti. *See Lam*, 979 F.3d at 679–80 (holding an official had discretion where it was "up to the Senior Park Ranger to use his judgment in carrying out the [policy] requirements while weighing policy choices, such as costs and available volunteers."). Whether Agent Boone's weighing and considerations were adequate is irrelevant. "[A]t step one of the discretionary-function-

---

[2]   Perez Perez does not allege that any of the circumstances in which the 2023 Pursuit Policy prohibits a pursuit applies. (*Compare* Doc. No. 1, *with* Doc. No. 11 at 20 (§ 8.47).)

exception analysis, all that matters is that there was, in fact, discretion." *Chadd v. United States*, 794 F.3d 1104, 1111 (9th Cir. 2015) (citing *Gaubert*, 499 U.S. at 322).[3]

Turning to whether Agent Boone should have terminated the pursuit, Perez Perez claims that Agent Boone was required to terminate the pursuit because the "risks to public safety . . . outweighed the need for immediate capture." (Doc. No. 1 ¶ 17.) Although it is true that the 2023 Pursuit Policy states that "Authorized Officers/Agents shall Terminate a Vehicular Pursuit when the danger to the public, the officer/agent, other law enforcement, or vehicle occupants outweighs the immediate need to apprehend the subject," the surrounding context makes clear that this language does not create a mandatory requirement. (Doc. No. 11 at 18 (§ 8.41).) In requiring a pursuing agent to assess whether a pursuit is warranted by weighing the risks of a pursuit against the need to apprehend a suspect, "the very nature of [this 2023 Pursuit Policy] requirement[] allows the exercise of . . . judgment and discretion." *Lam*, 979 F.3d at 679. In turn, this use of "mandatory-sounding language such as 'shall' does not overcome the discretionary character of the" 2023 Pursuit Policy. *Gonzales v. United States*, 814 F.3d 1022, 1030 (9th Cir. 2016).

Accordingly, Agent Boone had discretion to initiate and to terminate his pursuit.

### 4. Agent Boone's decisions whether to initiate and terminate the pursuit are susceptible to policy analysis.

The Court turns to the second part of its inquiry, "whether the conduct was susceptible to being based upon social, economic, or political policy." *Bibeau*, 339 F.3d at 945. "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324.

---

[3] Additionally, insofar as the 2021 Pursuit Policy did not apply to Agent Boone's pursuit of the Infiniti, Perez Perez's claims that Agent Boone and his supervisors failed to comply with other alleged aspects of the superseded policy lack merit. (*See, e.g.*, Doc. No. 1 ¶¶ 17, 18, 31, 33, 36, 58, 61.)

Agent Boone's conduct was susceptible to being based on social, economic, or political policy. As *Herrera* aptly explained,

> [d]ecisions concerning whether to initiate, continue, or terminate a pursuit implicate competing policies. On the one hand, "law enforcement agents have a mandatory duty to enforce the law," *Horta v. Sullivan*, 4 F.3d 2, 21 (1st Cir. 1993), which must be balanced against the safety concerns of the general public as well as minimizing economic losses and political concerns.

No. 09-cv-00756-JM-WMc, 2010 WL 4236974, at *4.

Under these circumstances, the Discretionary Function Exception applies to Agent Boone's decision to initiate his pursuit of the Infiniti and his corresponding decisions to continue and not terminate the pursuit. In turn, the exception bars any claims based on these decisions. To the extent that Counts Three and Four are based on these choices, Counts Three and Four are **DISMISSED WITH PREJUDICE**.

### 5. Agent Boone and his supervisors complied with the 2023 Pursuit Policy's training requirement.

The sole remaining basis for Counts Three and Four is the United States' alleged failure to adequately train or supervise Agent Boone because he "failed to complete the mandatory biennial refresher training on pursuit policies in 2024." (Doc. No. 1 ¶¶ 42, 81, 88.)

The United States raises a factual challenge against these claims. (Doc. No. 4-1 at 15.) The United States points out that Agent Boone completed his refresher training on September 10, 2024, and presents Agent Boone's and his supervisor's training records to support this defense. (*Id.*; *see also* Doc. No. 4-5 at 17 (supervisor proof of completion on September 16, 2024), 36 (Agent Boone's proof of completion on September 10, 2024), 49 (Agent Boone's Certificate of Training).)

Because the United States raises a factual challenge, the Court need not presume the truthfulness of Perez Perez's allegations and may instead review evidence beyond the complaint. *Safe Air*, 373 F.3d at 1039. Once a movant presents a factual challenge, "the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its

25-cv-01821-AJB-SBC

burden of establishing subject matter jurisdiction." *Id.* (quoting *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003)).

Here, Perez Perez's unsigned opposition concedes that Agent Boone was trained, contrary to Perez Perez's initial allegation. (*Compare* Doc. No. 7 at 6 ("Boone's training records confirm he knew these rules"), *with* Doc. No. 1 ¶ 42.) Thus, it appears Perez Perez has abandoned this basis for Counts Three and Four. Counts Three and Four are consequently **DISMISSED WITH PREJUDICE** in their entirety.

## IV. CONCLUSION

For the foregoing reasons, the United States' motion to dismiss is **GRANTED**. Because amendment would be futile, the Action is **DISMISSED WITH PREJUDICE**. The Clerk of Court is **DIRECTED** to close the case.

**IT IS SO ORDERED**.

Dated: June 4, 2026

Hon. Anthony J. Battaglia
United States District Judge

25-cv-01821-AJB-SBC